*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
———————————

UNITED STATES OF AMERICA,
                         *Plaintiff-Appellant,*

                   *v.*                                     No. 12-1015

YU QIN and SHANSHAN DU,
                         *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cr-20454—Marianne O. Battani, District Judge..

Decided and Filed:  July 20, 2012[*]

Before:  COLE and DONALD, Circuit Judges; SARGUS, District Judge.[**]

———————————

**COUNSEL**

**ON BRIEF:** Kathleen Moro Nesi, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan for Appellant.  Frank D. Eaman, FRANK D. EAMAN PLLC, Detroit, Michigan, Robert M. Morgan, Detroit, Michigan, for Appellees.

———————————

**OPINION**

———————————

        BERNICE BOUIE DONALD, Circuit Judge.  On July 21, 2010, Yu Qin and his wife Shanshan Du (collectively, "Defendants") were indicted for, among other related charges, conspiring to possess and possessing stolen trade secrets and wire fraud.  Upon receiving notice of the government's intent to introduce evidence under Rule 404(b) of

———————————

[*] This decision was originally issued as an "unpublished decision" filed on July 20, 2012.  The court has now designated the opinion as one recommended for full-text publication.

[**] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

1

the Federal Rules of Evidence, Defendants moved to exclude the evidence. On December 9, 2011, the district court granted the motion. The government timely appealed. For the reasons assigned herein, we affirm.

## I. BACKGROUND

From 1985 to 2005, Yu Qin (pronounced "Chin") worked as an electrical engineer in Troy, Michigan, for Controlled Power Company ("CPC"), a company that designs and manufactures electrical power equipment and systems. From 1997 until his termination on August 30, 2005, Qin held the position of Vice President of Engineering and Research and Development at CPC. Qin's wife, Shanshan Du, also worked as an electrical engineer for CPC until some time in 2000. Thereafter, Du began working for General Motors ("GM") as an engineer in its Advanced Technology Vehicles Group. At GM, Du worked on various software engineering projects related to hybrid vehicle technology and was responsible for some of the motor control code used in GM's hybrid electric motor controller cards. These cards constitute proprietary information owned by GM. During the course of their employment, both Qin and Du signed documents in which they agreed to protect the confidential and/or proprietary information belonging to their respective employers. Du further agreed to return "all documents and other materials containing any GM business or technical information or other proprietary information created or obtained in the course of [her] service[]" at GM.

On January 30, 2005, Du's supervisor at GM, apparently dissatisfied with Du's job performance, offered Du a severance agreement in return for her resignation. Du accepted the offer in writing on March 14, 2005. During Du's exit interview on March 17, 2005, Du certified in writing that she had "returned all GM Records in printed (copies or reproductions), electronic or other tangible form including secret and confidential information in [her] possession or under [her] control, located in [her] office, home or any other off-site location." Du also acknowledged that her "obligation not to disclose secret or confidential information [would] continue[] after the termination of [her] employment."

By summer 2005, CPC's Vice President of Operations, Christian Tazzia, had become suspicious that Qin was engaging in outside business activities. Tazzia soon discovered through another CPC employee that Qin owned and operated a business known as Millennium Technologies International, Inc. ("MTI"). Qin had been operating this business unbeknownst to CPC since at least 2000. Based on MTI's website, the business appeared to be in direct competition with CPC, promoting products that CPC's own Research and Development Department—of which Qin was Vice President—had been developing for years.

On August 30, 2005, CPC confronted Qin about these activities, and Qin initially denied any involvement in MTI business. Later that day, CPC employees discovered a bag belonging to Qin hidden in a co-worker's office. The bag contained a large quantity of electrical components later identified as CPC property and a large external hard drive determined to be Qin's personal property. Tazzia reviewed the contents of the hard drive and discovered a directory titled "Shanshan" that contained many electronic documents that appeared to be the property of GM. CPC subsequently advised GM of its discovery of these documents, whereupon GM conducted its own forensic analysis of the hard drive. GM's analysis revealed that the "Shanshan" directory contained 16,262 individual files, the majority of which were confirmed to be the property of GM. The forensic analysis also indicated that all 16,262 files had been copied to the hard drive on February 2, 2005, three days after GM offered Du a severance package. The files contained numerous confidential GM documents, including at least four pieces of GM intellectual property essential to GM's hybrid motor controller card. Most of this intellectual property was information that Du would have had no legitimate reason to possess during the ordinary course of her employment with GM. In fact, even Du's former supervisor did not have access to some of this information, nor would he have had any legitimate need to access it. Other confidential information located in the "Shanshan" directory included detailed specifications for the power transistors used by GM in its hybrid motor inverters; GM's requirements for its hybrid electric vehicle drive train, including the motor, inverter, and controller card; a complete user manual for GM's proprietary suite of engineering and design software used in the development of

its hybrid electric vehicles; and documents that detailed GM's E67 engine controller mechanization. According to GM, there was no legitimate need for Du in her capacity as a GM employee to access or possess the vast majority of this information.

This discovery prompted further investigation into MTI's business activities, which showed that MTI had been marketing power control products for the hybrid electric vehicle market. CPC uncovered evidence that Qin had directed subordinate CPC employees to perform engineering work for MTI on CPC company time as well as evidence that MTI was engaged in a project to develop a hybrid electric vehicle with Chinese automobile manufacturer Chery Automobile. Qin's hard drive also contained evidence indicating that he had misappropriated CPC resources and information and used them to further his MTI business. In particular, CPC found documents related to its development of a three-phase uninterruptible power system, including source code, circuit board schematic drawings, and marketing materials. All of these materials had been modified, however, such that "CPC" had been replaced with "MTI" as the owner of the intellectual property.

On July 22, 2010, Defendants were charged with one count of conspiring to obtain trade secrets from GM pertaining to motor controls for hybrid vehicles, two counts of unlawfully possessing those trade secrets with intent to provide them to third parties, one count of wire fraud, and, as to Qin only, one count of obstruction of justice. None of the conduct charged in the indictment related to Qin's possession of parts, resources, intellectual property, or other confidential information belonging to CPC.[1]

On November 1, 2011, the government provided Defendants' counsel with notice of its intent to offer evidence at trial pursuant to Federal Rule of Evidence 404(b). The evidence consisted of "proof that defendant Qin appropriated resources of his employer . . . for the benefit of MTI." On November 15, 2011, Defendants filed a joint motion to

---

[1]CPC initiated a civil lawsuit in Oakland County Circuit Court that lists several causes of action against Defendants. While one of those claims alleges a trade secret violation, the search of Defendants' homes pursuant to the warrant in this case did not uncover any trade secrets of CPC, and Defendants have never been indicted for possessing any trade secrets of CPC. Rather, the principal basis of CPC's civil suit is that Qin unfairly competed against CPC by forming a separate company and making products that competed with CPC. Du is named in that case because of her ownership interest in MTI.

exclude the 404(b) evidence. They argued that Qin had many defenses to CPC's allegations and, therefore, that introducing those allegations in the criminal proceedings would not only be inappropriate, but would be unduly burdensome, essentially resulting in a trial within a trial. Defendants also argued that the evidence would be more prejudicial than probative under Rule 403, particularly as to Du, to whom CPC did not attribute any of the underlying conduct forming the basis of CPC's civil complaint. The government responded on November 29, 2011, arguing that the evidence was relevant to show Defendants' specific intent to commit the charged offenses, their participation in a common scheme or plan, and the absence of mistake, all of which are at issue by virtue of the elements of the criminal charges.

On December 6, 2011, the district court held a hearing in which it granted Defendants' motion to exclude the proffered evidence. In support of this ruling, the court stated:

> [What] you are talking about here [is] stealing trade secrets. . . . When I look at what the Government has outlined here, . . . it shows that Defendant – at least Defendant Qin is setting up this business, working this business. They obviously have a business. I don't think that's an issue that they have a business.
>
> Using CPC documents, I mean, they substituted . . . MTI into wherever it said CPC, this is something, I don't know whether it is more of a generic form as . . . the defense is trying to say or a form that is used that could be modified, but is that stealing? I mean, I don't see it. I don't see it as a substantially similar circumstance. I think what it goes to show is that these individuals or at least Mr. Qin is setting up this business. Was he doing it while he was working at CPC? Clearly he was doing it while he was working at CPC, but does that show that he was stealing things outside of perhaps time, which I don't think is necessarily relevant. . . .
>
> I simply don't think there is . . . substantially enough relevance to this and that it could be way more prejudicial than probative because to me its weight only goes to showing that they were, in fact, setting up a business and doing so on CPC time, so the Court is not going to allow [the evidence].

This interlocutory appeal followed, and proceedings in the district court were stayed pending resolution of the issue now before us.

## II. ANALYSIS

### A. Standard of review

We review a district court's ruling on the admissibility of evidence for abuse of discretion. *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002). We will find that a district court has abused its discretion when we are "left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Jenkins*, 345 F.3d 928, 936 (6th Cir. 2003) (quoting *United States v. Copeland*, 321 F.3d 582, 595 (6th Cir. 2003)).

### B. Prior bad acts

A trial judge is accorded broad discretion in determining the admissibility of bad acts evidence under Rule 404(b). *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007). The Rule provides, in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." Fed. R. Evid. 404(b). This circuit employs a three-step process for determining the admissibility of such evidence:

> *First,* the district court must decide whether there is sufficient evidence that the other act in question actually occurred. *Second*, if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. *Third*, if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect."

*Jenkins*, 345 F.3d at 937(citing *Haywood*, 280 F.3d at 719-20). Applying this standard, we are not left with a "definite and firm conviction that the district court committed a clear error of judgment" in excluding the evidence. *Id.* at 936. Accordingly, the district court's ruling is affirmed.

### 1.  Evidence that the act occurred

As to the first prong, the relevant inquiry is whether "there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).  As Defendants point out, this test is often met by the accused's admission that the prior act or conviction occurred. *See, e.g., United States v. Clay*, 667 F.3d 689, 694 (6th Cir. 2012) ("The [prior bad act] is undisputed, so no discussion is needed as to step one."); *Jenkins,* 345 F.3d at 937 ("[T]here is no doubt that the bad act occurred; [the defendant] freely admitted [it]."); *Haywood*, 280 F.3d at 720 ("Haywood concedes that the other act at issue . . . actually occurred.").  In the instant case, by contrast, Qin vigorously denies engaging in any improper conduct at CPC.  Thus, while the government contends that its proof would be relatively straightforward and would likely require only a few hours, Qin would have every incentive to refute the government's allegations with proof of his own, attempting to establish for the jury that the allegations are unfounded.

While the record does not establish that the district court made a definitive finding as to the first prong, it does show that the court considered the evidence and—at least implicitly—found it lacking.  Given the parties' positions, the evidence could reasonably support a finding on either side of this contentious issue, and we are inclined to agree that its resolution could easily become a trial unto itself.  For the purposes of this appeal, however, we will assume without deciding that there is sufficient evidence to support a jury finding that Qin appropriated CPC resources for the benefit of MTI.

### 2.  Probative of issue other than character

We turn, then, to whether the evidence is probative of a material issue other than character.  "Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered."  *Haywood*, 280 F.3d at 720.

Although the district court did not address the first part of this inquiry directly, the government clearly purported to offer the 404(b) evidence for an admissible purpose: to show Defendants' specific intent, participation in a common scheme or plan, and absence of mistake or accident.[2] *See, e.g., United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985) (noting other permissible uses of 404(b) evidence, including its use to show a common scheme or plan). The district court was likewise silent on the second prong, but we agree with the government's argument that its proffered purposes are material by virtue of the *mens rea* elements of the charged offenses and Du's defense that she only retained possession of the GM files inadvertently. Thus, our inquiry turns to whether evidence of Qin's alleged misappropriation of CPC parts, information, and time is probative of Defendants' specific intent to steal trade secrets from GM. *Id.*

"To determine if evidence of other acts is probative of intent, we look to whether the evidence relates to conduct that is 'substantially similar and reasonably near in time' to the specific intent offense at issue." *Haywood*, 280 F.3d at 721 (quoting *Blankenship*, 775 F.2d at 739). The district court based its exclusion of the 404(b) evidence on this prong, ruling that the proffered evidence was not probative of Defendants' criminal intent because it was not substantially similar to the charged offenses. We agree.

The government proffered evidence that Qin misappropriated CPC electrical parts for use in MTI products, that he used CPC forms and documents for the benefit of MTI, and that Qin and his subordinates conducted MTI business during CPC work time. The charged offenses, in contrast, were conspiracy to possess and unauthorized possession of trade secrets. These charges require the government to prove that Defendants stole information that GM had taken reasonable measures to keep confidential and that the stolen information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable

---

[2]We note, however, that it is a fine line the government attempts to draw between conduct that is part of a common scheme or plan and conduct that is in conformity with character. The government argues that "[a]llowing the jury to see the full picture in the context of the common scheme of stealing from employers to benefit their private company makes it more likely the jury will understand that Du's possession of GM trade secrets was for the benefit of MTI and not a mistake." In essence, the government would be asking the jury to find that Qin and Du stole from her employer by introducing evidence that Qin (possibly) stole from his. This sounds perilously close to the definition of improper character evidence.

through proper means by, the public[.]"   18 U.S.C. § 1839(3).   Moreover, the government must prove that Defendants stole this information with the specific intent to convert it for the economic benefit of someone other than GM.  *Id.* at § 1832(a). While it is possible to generalize Qin's alleged conduct in such a way as to make it sound substantially similar to the conduct charged in the indictment (e.g., Qin stealing from CPC is substantially similar to Qin and Du stealing from GM), that would be an over-simplification.  Pilfering office supplies—or discarded electrical parts, for that matter—and conducting personal business on company time may well constitute theft, but they are of a fundamentally different character than stealing trade secrets, which involves gaining unauthorized access to highly confidential and valuable intellectual property and converting that information for one's own economic benefit.  We find no error in the district court's determination that these acts were not substantially similar.

### 3.  Probative value vs. prejudicial effect

Third, we consider the district court's Rule 403 determination.  *United States v. Johnson*, 458 F. App'x 464, 470 (6th Cir. 2012.)  Where relevant evidence carries with it the risk of unfair prejudice, confusion of the issues, misleading the jury, or undue delay, and that risk substantially outweighs the probative value of the proffered evidence, Rule 403 provides that the evidence may be excluded.  The district court found that, in addition to lacking probative value, the proffered 404(b) evidence would be highly prejudicial to Defendants and, thus, that it should be excluded.  We find that this determination was well within the bounds of the district court's discretion.

We have already touched briefly on the issue of undue delay, and reiterate here our concern that determining whether the allegations of Qin's misconduct at CPC are with or without merit could result in a trial within a trial.  In fact, the risk of undue delay is substantial enough that it is likely sufficient in itself to justify exclusion of the evidence under Rule 403.   In addition to lengthening the time needed for trial, presentation of the proffered evidence carries with it a high risk of confusing and/or misleading the jury.  Unlike a prior conviction, which is a discreet act or event that the prosecution could call to the jury's attention, the government seeks to introduce evidence

of a variety of alleged misconduct that occurred over the course of several years during Qin's employment at CPC. The amount of time and the number of witnesses needed to present and rebut these allegations would almost certainly influence the jury's perception of its relative importance and could cause confusion that this alleged conduct is part of the criminal charges for which Defendants are on trial. This is especially true where the government continually refers to the conduct as part of Defendants' common scheme or plan. In reality, the only scheme or plan charged in the indictment is Defendants' scheme to steal GM trade secrets, and the government has not established how Qin's use or misuse of CPC time and resources is part of Qin and Du's scheme to steal trade secrets from GM. The government argues generally that this conduct makes it "more probable that the defendants were engaged together in a common scheme or plan to defraud their employers for MTI's benefit." But the charges against Defendants are not so broad; they encompass only the alleged theft of GM trade secrets. By generalizing in this manner, the government increases the risk that the jury will interpret the 404(b) evidence in precisely the manner that the rule is intended to prohibit—namely, that Defendants are thieves who routinely steal from their employers for the benefit of their own company. Thus, presented in this manner, the evidence is not only likely to mislead the jury but also to unfairly prejudice Defendants.[3]

Finally, in response to the government's argument that the proffered evidence is probative of the absence of mistake, we note that "[o]ne factor in balancing unfair prejudice against probative value under Rule 403 is the availability of other means of proof." *Johnson*, 458 F. App'x at 470-71 (quoting *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996)). There is other evidence in the record that, in our view, is far more probative on this point than the proffered 404(b) evidence. For instance, Du certified in writing that she had returned all GM documents in her possession, thereby seriously undermining any argument that she simply "forgot" that she had the obligation to do so. The manner in which the information was copied to the

---

[3]This is especially true as to Du, who did not engage in any of the alleged misconduct at CPC that is the subject of the proffer. The government would be arguing that Qin's alleged misconduct at CPC is evidence of Du's criminal intent to steal from GM.

hard drive is also highly probative.  These were not simply many years' worth of work files that Du accumulated on her hard drive over the course of her employment; rather, all 16,262 files were copied to Du's hard drive at the same time.  A jury will likely be skeptical that this occurred "accidentally," particularly in light of the fact that the files were copied *three days after* Du was asked to resign.  Finally, the content of the files is also highly suggestive of the absence of mistake, as, according to the government, Du would never have had any legitimate reason to access most of the information contained in the files.  In other words, her retention of the files after her termination can hardly be "innocent" if she was never authorized to possess them in the first place.

### III.  CONCLUSION

Upon consideration of all relevant factors, we find that the district court did not abuse its discretion in excluding the 404(b) evidence.  Accordingly, we **AFFIRM**.